# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **CMI ROADBUILDING, INC.** and **CMI ROADBUILDING, LTD.,** | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. CIV-18-1245-G |
| **SPECSYS, INC.,** | )<br>)<br>) |
| Defendant. | )<br>) |

## ORDER

This lawsuit stems from a series of purchase orders (the "Purchase Orders") whereby Defendant SpecSys, Inc. ("SpecSys") agreed to manufacture mobile equipment and provide related design and engineering services to Plaintiff CMI Roadbuilding, Inc. ("CMI Inc."). The business relationship soured and, on December 20, 2018, CMI Inc. and its parent company CMI Roadbuilding Ltd. ("CMI Ltd.") filed the instant lawsuit, asserting a number of claims against SpecSys. *See* Compl. (Doc. No. 1); Am. Compl. (Doc. No. 78). SpecSys has counterclaimed to recover payment on outstanding invoices and to recover for work performed under a theory of quantum meruit. *See* Countercl. (Doc .No. 10); Am. Countercl. (Doc. No. 23).

The core issues in the case are: (1) whether SpecSys breached the Purchase Orders and/or the parties' Confidentiality and Non-Disclosure Agreement ("NDA"); (2) what amounts, if any, CMI Inc. owes SpecSys under outstanding invoices and for work otherwise performed by SpecSys and accepted by CMI Inc.; and (3) what items, if any, SpecSys is obligated to turn over to Plaintiffs. The case is set for jury trial, which is

scheduled to begin on July 6, 2021.

On June 21, 2021, following review of the parties' Second Amended Final Pretrial Report (Doc. No. 381) and respective motions in limine, trial briefs, and proposed jury instructions, the Court held a hearing. The Court identified a number of unresolved legal issues that will dictate the Court's rulings on evidentiary matters, the formulation of jury instructions, and potentially other aspects of the trial. These issues include: (1) whether and to what extent certain Purchase Orders incorporate by reference the terms of proposals authored by SpecSys (the "Proposals"); (2) whether and to what extent the Purchase Orders are governed by Article 2 of the Uniform Commercial Code ("UCC"); and (3) whether and to what extent the NDA is ambiguous and may therefore be interpreted with the aid of extrinsic evidence.[1] The parties delivered oral argument on these and other issues. Neither party requested to present evidence outside the presence of the jury on the matters raised. The Court makes the following rulings based on the parties' oral arguments and relevant written submissions.[2]

I. *Incorporation by Reference*

As a threshold matter, the Court must ascertain the scope of the parties' written

---

[1] The Court previously determined that Purchase Order 18645 is "ambiguous as to the scope of work required." Order of May 28, 2021 (Doc. No. 341) at 9. Neither party contends that any of the remaining Purchase Orders are ambiguous in whole or in part.

[2] These rulings, addressing how the Court will instruct the jury on certain issues and what evidence will be permitted, are made in advance of the presentation of evidence in the case for the purpose of promoting a more efficient and fair trial. Because the rulings are based on the parties' stated expectations of what the evidence at trial will be, they are necessarily *in limine* and may be revisited if the evidence actually presented differs from what is expected.

agreements. At the June 21, 2021 hearing, the parties agreed that this is a matter properly determined by the Court. *See* June 21, 2021 Hr'g Tr. (Doc. No. 415) 13:24-14:24.

Plaintiffs contend that the Purchase Orders are fully "integrated" agreements and are "subject to [CMI Inc.'s] standard Terms and Conditions." Pls' Trial Br. (Doc. No. 350) at 13. With respect to each transaction, Plaintiffs primarily argue that the Purchase Order constituted the "offer," which SpecSys accepted by "commencement of work." *Id.* at 13-16.

SpecSys does not dispute that the Purchase Orders constituted "offers" or contest that SpecSys accepted such offers by beginning work on the projects. It argues, however, that pursuant to the doctrine of incorporation by reference, the Proposals affixed to seven of the Purchase Orders—namely, Purchase Orders 17580, 18643, 18644, 18645, 20501, 22015, and 22016—formed part of the offers that SpecSys accepted. Def.'s Resp. to Pls' Trial Br. (Doc. No. 378) at 16-17.

Under Oklahoma law, "parties may incorporate by reference separate writings, or portions thereof, together into one agreement" where three requirements are met: "(1) the underlying contract makes clear reference to the extrinsic document, (2) the identity and location of the extrinsic document may be ascertained beyond doubt, and (3) the parties to the agreement had knowledge of and assented to its incorporation." *Walker v. Builddirect.Com Techs. Inc.*, 349 P.3d 549, 554 (Okla. 2015). Whether and to what extent extrinsic material has been incorporated into an agreement presents a question of law for resolution by the Court. 11 Richard A. Lord, *Williston on Contracts* § 30:25 (4th ed. 1999).

As noted, the Purchase Orders in question were issued with the Proposals affixed

thereto. Moreover, the Purchase Orders refer to the Proposals—repeatedly, in some cases—for details pertinent to the projects. Purchase Order 17580, for example, states that SpecSys shall manufacture TR-4 machines in accordance with "attachments" to the Purchase Order and that the applicable prices are "as described in [SpecSys'] [P]roposal dated December 22, 2017." Doc. No. 78-16 at 2. Absent reference to the Proposals, a number of the Purchase Orders would be wholly devoid of the detail necessary to make the parties' contractual undertakings discernible. For example, Purchase Orders 18643, 18644, and 18645 simply instruct SpecSys to proceed "[p]er the attached Proposal reference." Doc. No. 78-26 at 9, 13, 16; *see also* Doc. No. 78-33 at 3 (agreement for "Lot of Engineering Manpower for the support and design of CMI Mobile Equipment noted in SpecSys proposal 050418_5875 Rev B").

The Court concludes that the transactions memorialized by Purchase Orders 17580, 18643, 18644, 18645, 20501, 22015, and 22016 consist of each Purchase Order *together with* the Proposal affixed thereto.[3] The jury will be so instructed.

This is the position advanced by SpecSys during the June 21, 2021 hearing and, despite Plaintiffs' insistence otherwise, appears to be consistent with Plaintiffs' substantive

---

[3] Each Purchase Order provides: "This Agreement is the complete, final and exclusive statement of the terms of the agreement between the parties and supersedes any and all prior or contemporaneous negotiations and agreements, whether oral or written." Doc. No. 78-16 at 7; Doc. No. 78-26 at 12, 15, 19; Doc. No. 78-33 at 5; Doc. No. 78-36 at 9; Doc. No. 78-46 at 5, 9. This type of provision does not preclude the incorporation of extrinsic material. *See Summit Contractors, Inc. v. Legacy Corner, L.L.C.*, 147 F. App'x 798, 801 (10th Cir. 2005) (explaining that a merger clause constitutes "strong evidence that the parties did not intend to include *terms not expressly incorporated* into the document containing the clause") (emphasis added).

4

view as well. *See* Pls' Trial Br. at 13 (stating that the Proposals were included as attachments to the Purchase Orders to "provide additional descriptions of what [CMI Inc.] was paying for"); *id.* at 15 (stating that the Proposals "merely illustrate what [CMI Inc.] was buying").[4] Plaintiffs' true concern appears to be enforcement of the Purchase Orders' boilerplate "Terms and Conditions" and the possibility that a term therein may be contradicted by a term in the Proposals. *See* Pls' Trial Br. at 13-16; June 21, 2021 Hr'g Tr. 9:11-13 ("To the degree that the purchase order contains different terms, the purchase order governs over this proposal"). But Plaintiffs do not identify—nor can the Court independently ascertain—any portion of the Proposals that is materially incompatible with the specified "Terms and Conditions." The jury will be instructed regarding the applicable rules of contract construction, including rules for reconciling inconsistencies between contract terms.

## II. *Applicability of the UCC*

The Court must next decide whether the Purchase Orders are governed by Article 2 of the UCC or by non-UCC Oklahoma contract law. Article 2 of the UCC "applies to

---

[4] Plaintiffs assert that Okla. Stat. tit. 12A, § 2-207(2) is "[c]entral to this Court's task to interpret the parties' contracts." Pls' Trial Br. at 13. However, § 2-207(2) "provides the standard for determining [whether] additional terms stated in the *acceptance* become part of the contract." *Victory Energy Operations, LLC v. Legacy Mech., LLC*, No. 20-CV-157, 2020 WL 7014595, at *7 (N.D. Okla. June 15, 2020) (citing *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1578 (10th Cir. 1984) (emphasis added). In this case, neither party contends that SpecSys' Proposals constitute the "acceptance" for any of the transactions. Indeed, most of the Proposals "expired by their terms before the [Purchase Orders] . . . were issued" and thus "could not be accepted" by CMI Inc. Pls' Trial Br. at 14; *see* Okla. Stat. tit. 15, § 73(2); Okla. Stat. tit. 12A, § 2-207. Accordingly, § 2-207(2) is immaterial, even assuming the Purchase Orders are governed by the Uniform Commercial Code.

5

transactions in goods." Okla. Stat. tit. 12A, § 2-102. "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid." Okla. Stat. tit. 12A, § 2-105. This definition "exclude[s] information"; therefore, Article 2 "does not directly apply to an electronic transfer of information." Okla. Stat. tit. 12A, § 2-105 Okla. Code Cmt. 1. "Information" is not defined in Article 2 but is generally understood to encompass "data, text, images, sounds, codes, computer programs, software, databases, or the like." Okla. Stat. tit. 12A, § 15-102(12).[5]

"Where a contract includes the sale of both goods and the delivery of services . . . courts evaluate the transaction in its entirety and determine whether the goods or services aspect of the contract predominates." *Okla. Gas & Elec. Co. v. Toshiba Int'l Corp.*, No. CIV-14-0759-HE, 2016 WL 3659941, at *3 (W.D. Okla. July 1, 2016). "In making the 'predominance' determination, a court looks to the language of the contract, the surrounding circumstances, the relationship between the goods and services, the compensation structure, the intrinsic worth of the goods provided, and other factors." *Id.*; *see also Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1174 (10th Cir. 2008) (applying the "predominant factor" test as Oklahoma law would most likely apply it). Ultimately, "it is the substance of the Agreement that controls"—not the label the parties give to the transaction. *Eureka Water Co. v. Nestle Waters N. Am., Inc.*, 690 F.3d

---

[5] The Oklahoma Code Comments to § 2-105 reference the definition for "information" contained in Oklahoma's Uniform Electronic Transactions Act, Okla. Stat. tit. 12A, §§ 15-101 et seq. and its federal counterpart.

1139, 1148 (10th Cir. 2012). Thus, a contract entitled "Purchase Order" may in fact be predominantly for services, even though the label may suggest otherwise.

In some cases, "the transaction is entirely within or outside [the scope] of Article 2." Okla. Stat. tit. 12A, § 2-105 Okla. Code Cmt. 1. In other cases, Article 2 may apply to some "portion of the transaction": "[I]f a transaction is not fully within Article 2 but includes information and goods, the article does not apply to the part involving information, including informational rights in it and creation or modification of it, or . . . to the media on which the information is contained." *Id.* The comments to the statute further explain:

> [T]he sale of "smart goods" such as an automobile is a transaction in goods fully within Article 2 even though the automobile contains many computer programs—the automobile is still an automobile. On the other hand, an architect's provision of architectural plans online or on a computer disk or a vendor's supplying software online or on a disk subject to a license would not be a transaction in goods.

*Id.*

The parties agree that Purchase Order 20501 is predominantly for services and is therefore governed by non-UCC contract law. *See* June 21, 2021 Hr'g Tr. 9:18-21; Def.'s Resp. to Pls' Trial Br. at 13-14. With respect to the remaining Purchase Orders—namely, Purchase Orders 17580, 18643, 18644, 18645, 21234, 22015, and 22016—Plaintiffs contend that Article 2 of the UCC applies, while SpecSys contends that non-UCC contract law applies.

A.  Purchase Order 17580

Under Purchase Order 17580, SpecSys agreed to manufacture and assemble four

TR-4 machines for CMI Inc. *See* Doc. No. 78-16 at 2-11.[6] CMI Inc. was to supply SpecSys with design documentation in addition to various materials and component parts. *Id.* at 2. SpecSys was responsible for buying the remaining material and hardware required for assembly and for providing necessary labor, management, and quality control. *Id.* at 2, 8.

The Court concludes that the predominant purpose of Purchase Order 17580 is the sale of goods—specifically, the sale of four TR-4 machines—and therefore, Article 2 of the UCC governs the transaction. The Court is not persuaded by SpecSys' attempt to characterize Purchase Order 17580 as a contract for "manufacturing services." Def.'s Resp. to Pls' Trial Br. at 15. This theory, if adopted, would render Article 2 practically obsolete. Indeed, "virtually all commercial goods involve some type of service, whether design, assembly, installation, or manufacture." *Mecanique C.N.C., Inc. v. Durr Env't, Inc.*, 304 F. Supp. 2d 971, 977 (S.D. Ohio 2004) (citation and internal quotation marks omitted). "The mere fact that a manufacturer [uses] its effort and expertise in producing a good does not mean that the buyer is purchasing those services instead of the good itself." *Id.*; *see also Propulsion Techs., Inc. v. Attwood Corp.*, 369 F.3d 896, 900-901 (5th Cir. 2004) (holding that a contract to manufacture custom designed propeller castings was a transaction in goods); *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1331 (11th Cir. 1998) (holding that a contract for the design, manufacture, and installation of automated production-line equipment was a transaction in goods).

---

[6] On May 23, 2018, the parties executed a Change Order to Purchase Order 17580 "for Hydraulic System Plumbing documentation." Pls' Proposed Trial Ex. 15 at 2-3. Neither party contends that the Change Order materially altered the nature of the transaction.

B.   Purchase Order 21234

The Court reaches the same conclusion that Article 2 of the UCC applies with respect to Purchase Order 21234, which embodies an agreement for the manufacture and delivery of wiring harnesses used in the assembly of CMI Inc.'s TM-11 machine.[7]  *See* Doc. No. 78-36 at 3-9.

C.   Purchase Order 18643

Purchase Order 18643 involved three phases of engineering work to update the existing design for CMI Inc.'s TP-4 machine.  *See* Doc. No. 78-26 at 9-12; 2-4.  As originally issued, Purchase Order 18643 covered Phase 1 of the initiative: "Concept Design."  *Id.* at 2-4, 9.  The parties executed a Change Order on May 23, 2018, whereby SpecSys was to proceed to Phase 2: "Detail Design."  Pls' Proposed Trial Ex 16 at 1.  Phase 2 "focuse[d] primarily on engineering requirements needed in order to take the [TP-4] design to the manufacturing process."  Doc. No. 78-26 at 3.  A second Change Order was issued on July 10, 2018, pursuant to which SpecSys was to advance to Phase 3: "Print Development."  Pls' Proposed Trial Ex 16 at 1-2.  Phase 3 focused on "developing the documentation required in the manufacturing process consisting of assembly prints, weld

---

[7] In their respective trial briefs, the parties do not specifically address the applicability of the UCC to Purchase Order 21234, presumably because this Purchase Order was the subject of a previous order granting summary judgment in favor of Plaintiffs.  *See* Order of May 28, 2021 (Doc. No. 336).  Despite the prior ruling, the Court must determine whether the transaction is governed by Article 2 of the UCC or non-UCC common law insofar as it may prove relevant to the availability of damages.

prints, individuals piece part drawings, electrical schematics and hydraulic schematics as required per contract needs." Doc. No. 78-26 at 4.

The Court concludes that Purchase Order 18643 is a predominantly services-based contract and thus is governed by non-UCC contract law. Although, as Plaintiffs point out, the project yielded a number of deliverables, most if not all of those deliverables—consisting largely of two- and three-dimensional drawings, prints, and schematics[8]—do not constitute "goods" within the meaning of Article 2 of the UCC. Okla. Stat. tit. 12A, § 2-105. These items are analogous to electronically stored "architectural plans," which are categorically excluded from the statutory definition of "goods." *See* Okla. Stat. tit. 12A, § 2-105 Okla. Code Cmt. 1. To the extent any of the items are "goods" within the meaning of Okla. Stat. tit. 12A, § 2-105, which is unlikely,[9] the Court concludes that their delivery was incidental to the provision of services. *See Harvell v. Goodyear Tire & Rubber Co.*, 164 P.3d 1028, 1034 n. 25 (Okla. 2006) ("When a transaction relates primarily to services, an incidental sale of merchandise does not make it a contract for the sale of goods governed by the Uniform Commercial Code").

D.   Purchase Order 18644

Under Purchase Order 18644, SpecSys agreed to create a manual for the TR-4 machine. *See* Doc. No 78-26 at 13-15; 5-6. The manual would include two sections—one

---

[8] *See* Decl. of Kevin Wald ("Wald Decl.") (Doc. No. 245-4) ¶¶ 6, 8; Decl. of Dave Gelhar ("Gelhar Decl.") (Doc. No. 245-5) ¶¶ 6, 9.

[9] SpecSys allegedly delivered four analysis/design booklets under Purchase Order 18643. *See* Wald Decl. ¶ 6; Gelhar Decl. ¶ 6. For the reasons stated in Section II.D, the booklets do not likely fit within § 2-105's definition of "goods."

addressing "Operation, Safety, and Maintenance" and the other addressing "Parts"—and would be delivered to CMI Inc. as "PDF and Word document files." *Id.* at 5. SpecSys agreed that "[a]ll designs and deliverables produced by SpecSys for this effort, including patents, [would] become and remain exclusive property of CMI [Inc.]." *Id.* at 6.

The Court concludes that the manual contemplated by Purchase Order 18644 does not meet the UCC definition of "goods," and the transaction is therefore governed by non-UCC contract law. The manual was conceived as a work of intellectual property, as reflected in SpecSys' assignment to CMI Inc. of ownership rights to "designs and deliverables." Doc. No 78-26 at 6. Article 2 "does not govern generally intellectual property." Okla. Stat. tit. 12A, § 2-105 Okla. Code Cmt. 1. Indeed, the manual was to be delivered to CMI Inc. in electronic format; the transaction thus involved an electronic transfer of information of the type expressly recognized in the comments to the UCC as excepted from Article 2. *See id.*

Moreover, the primary effort under Purchase Order 18644 consisted of services: organizing, drafting, revising, and most importantly "ma[king] choices regarding which concepts and ideas to include" in the manual and "how to express those concepts." *B2B CFO Partners, LLC v. Kaufman*, 787 F. Supp. 2d 1002, 1007 (D. Ariz. 2011) (holding that a manual was entitled to copyright protection). This likewise reflects that Purchase Order 18644 was not a transaction in goods. *Cf. id.*; *Axxiom Mfg., Inc. v. McCoy Invs., Inc.*, 846

F. Supp. 2d 732, 747-48 (S.D. Tex. 2012) (collecting cases for proposition that "manuals organizing factual information in a useful manner" are "copyrightable compilations").

E. Purchase Order 18645

Under Purchase Order 18645, SpecSys agreed to provide control support services to CMI Inc. related to the TR-4 and TP-4 projects.[10] *See* Doc. No. 78-26 at 16-19; 7-8. As noted in the Court's Order of May 28, 2021, Purchase Order 18645 is ambiguous as to the scope of work to be undertaken. *See* Order of May 28, 2021 (Doc. No. 341) at 9. Plaintiffs' position is that SpecSys promised to resolve a coding error in the TR-4 machine that was preventing the engine from communicating with the machine's display screen, while SpecSys contends that PO 18645 contemplated support services on an hourly basis with no fixed deliverable. *Id.* at 5-6.

Regardless of which interpretation prevails, the Court concludes that Purchase Order 18643 is a predominantly services-based contract and thus is governed by non-UCC contract law. The Court is not persuaded by Plaintiffs' argument that PO 18645 was a transaction in goods merely because it yielded deliverables. The deliverables cited—a document entitled "Solutions to Controls Issues Raised by CMI," which is not in dispute, and corrected code, which is in dispute[11]—are intellectual property excluded from the UCC

---

[10] CMI Inc. initially agreed to pay $1,000 for "Control Support Services" on the TR-4 project and $1,000 for "Control Support Services" on the TP-4 project. Doc. No. 78-26 at 16. On April 4, 2018, CMI issued a Change Order authorizing an additional $1,000 for "20 hours of technical assistance" on the TR-4 project. Doc. No. 225-9 at 1.

[11] *See* Pls' Trial Br. at 8, 16; Wald. Decl. ¶ 6; Gelhar Decl. ¶ 6.

definition of "goods" and are, in any event, incidental to the provision of services. *See Harvell*, 164 P.3d at 1034 n. 25.

F. Purchase Orders 22015 and 22016

Pursuant to Purchase Order 22015, SpecSys agreed to develop, test, and debug software and controls on CMI's SP-5 machine and provide related engineering services and documentation. *See* Doc. No. 78-46 at 2-5; Doc. No. 78-45 at 4-7. Pursuant to Purchase Order 22016, SpecSys agreed to do the same with respect to CMI's TM-11 machine. *See* Doc. No. 78-46 at 6-9. Both Purchase Orders contemplate the submission of "[d]etailed hour report[s]" by SpecSys, adjustment of priorities "as needed," and deliverables in the form of "harness design and drawings*." Id.* at 2, 6.

The Court concludes that Purchase Orders 22015 and 22016 are predominantly services-based and therefore governed by non-UCC contract law. Again, the Court is not convinced that the transactions were predominantly for goods simply because they contemplated delivery of certain items. The items in question—software code and two documents entitled "Controls Support and Review on SP-5" and "Controls Support and Review on TM-11"[12]—do not constitute "goods" within the meaning of Article 2 of the UCC. Okla. Stat. tit. 12A, § 2-105; *See Id.* Okla. Code Cmt. 1. At any rate, the Court concludes that their delivery was incidental to the provision of services reflected in these Purchase Orders. *See Harvell*, 164 P.3d at 1034 n. 25.

---

[12] Wald Decl. ¶¶ 6, 9; Gelhar Decl. ¶¶ 6, 9.

III. *Admissibility of Extrinsic Evidence to Interpret the NDA*

Finally, the parties' submissions raise the question of whether and to what extent the parties will be permitted to introduce extrinsic evidence to aid in the interpretation of the NDA. This determination hinges on whether any provision of the NDA is ambiguous and, if so, the nature of any such ambiguity.

The parties acknowledged at the June 21, 2021 hearing that these questions must be resolved by the Court. *See* June 21, 2021 Hr'g Tr. 10:2-12:23. The Court agrees that it falls within its role to "decide, as a matter of law, whether a contract provision is ambiguous" and to "interpret the contract provision as a matter of law where the ambiguity can be cleared by reference to other provisions or where the ambiguity arises from the contract language and not from extrinsic facts." *Okla. Oncology & Hematology P.C. v. US Oncology, Inc.*, 160 P.3d 936, 946 (Okla. 2007) (internal citations omitted); *see also Paclawski v. Bristol Labs., Inc.*, 425 P.2d 452, 456 (Okla. 1967).

To decide whether a contract provision is ambiguous, the Court must look to the language of the entire agreement. *Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 546 (Okla. 2003). A contract must be construed so "as to give effect to the mutual intention of the parties, as it existed at the time of contracting." Okla. Stat. tit. 15, § 152. With respect to written contracts, the parties' intent should be gleaned "from the writing alone, if possible," Okla. Stat. tit. 15, § 155, and from the language employed therein, so long as it is "clear and explicit, and does not involve an absurdity," Okla. Stat. tit. 15, § 154. Unless otherwise indicated, "[t]he words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning." Okla. Stat.

14

tit. 15, § 160. A contract provision is ambiguous when, applying these rules, "it is reasonably susceptible to at least two different constructions." *Pitco,* 63 P.3d at 545-46; *see also United States ex rel. Alamo Envtl., Inc. v. Cape Envtl. Mgmt., Inc.*, No. CIV-11-482-D, 2012 WL 6726571, at *4 (W.D. Okla. Dec. 27, 2012) ("The determination of whether a contract is ambiguous is made only *after* application of the pertinent rules of construction.").

The parties in this case press for different constructions of two NDA provisions. Each is discussed in turn below.

    A.    <u>Meaning of "Agents" and "Advisors"</u>

The NDA generally prohibits SpecSys from using or disclosing confidential and proprietary information ("Confidential Information") provided to it by CMI Inc. *See* Doc. No. 78-9 at 3-5. This prohibition is subject to an exception, which permits SpecSys to disclose Confidential Information to its "Representatives who have a need to know" such information and who "have been provided with a copy of [the NDA] and have agreed to be bound by the same or similar terms." *Id.* at 3. The NDA defines the term "Representatives" to mean "directors, officers, employees, agents or advisors" of SpecSys. *Id.*

SpecSys contends that certain third-party vendors to whom it disclosed Confidential Information qualify as "agents" and/or "advisors" of SpecSys and, therefore, such disclosures did not violate the NDA. Def.'s Resp. to Pls' Trial Br. at 19-20. Plaintiffs disagree, arguing that "[n]o reasonable interpretation of the NDA could include third

15

parties" in the definition of "agents" or "advisors."  Pls' Trial Br. at 18-19.[13]

In construing the NDA, the terms "agents" and "advisors" are to be given their "ordinary and popular" meaning.  Okla. Stat. tit. 15, § 160; *see also Serra v. Est. of Broughton*, 364 P.3d 637, 641 (Okla. 2015).  The Court finds that insofar as their application to a third-party vendor, these words are reasonably susceptible to multiple interpretations.  The Oxford English Dictionary contains numerous definitions for the term "agent," including, as potentially relevant here, "[o]ne who does the *actual work* of anything, as distinguished from the instigator or employer; hence, one who acts for another."  1 *Oxford English Dictionary* 248 (2d ed. 1989).  This definition, in turn, "has numerous specific applications . . . flowing directly from [its] general meaning."  *Id.*  The word "advisor," on the other hand, is broadly defined as "[o]ne who advises or counsels." 1 *Oxford English Dictionary* 193 (2d ed. 1989).

The Court concludes that, with respect to the meaning of "agents" and "advisors," the parties' intent is not clearly discernable from the language reflected in their agreement.  The Court further concludes that the meaning of "agents" and "advisors" cannot "be cleared by reference to other provisions" in the NDA.  *Okla. Oncology*, 160 P.3d at 946.  Consequently, the Court will allow extrinsic evidence of the parties' intent to be presented

---

[13] Both parties acknowledge that, if found to be ambiguous, the meaning of "agents" and "advisors" is a question of fact for resolution by the jury.  *See* Def.'s Resp. to Pls' Trial Br. at 19; Pls' Proposed Jury Instrs. (Doc. No. 353) at 21.  And both parties have, throughout the course of the litigation, pointed to extrinsic evidence in support of their respective positions.  *See, e.g.,* Def.'s Mot. (Doc. No. 245) at 13-16, 21-22; Pls' Resp (Doc. No. 286) at 8-9, 13-15; Pls' Trial Br. at 19.

to the jury. If such evidence is introduced, the Court will submit to the jury instructions calling for a finding as to the meaning of these ambiguous terms. *See Rock Island Imp. Co. v. Helmerich & Payne, Inc.*, 698 F.2d 1075, 1077 (10th Cir. 1983) (holding that the meaning of a contract term should not be submitted to the jury unless "the parties have introduced extrinsic evidence of their intent.").

  B. <u>CMI Inc.'s Right to Ownership and Possession of "Developments"</u>

Paragraph 3 of the NDA provides:

> In the event that [SpecSys] shall at any time create, discover, conceive, make, invent or reduce to practice any invention, modification, discovery, design, development, process or intellectual property right whatsoever or any interest therein (whether or not patentable or registerable under copyright or trademark statutes) (collectively, "Developments") that relates to [CMI Inc.'s] Business and results from exposure to [CMI's confidential information], then all such Developments and the benefits thereof are and shall immediately become the sole and absolute property of CMI.

Doc. No. 78-9 at 4.

Plaintiffs have variously suggested that the foregoing provision entitles CMI Inc. to immediate and unqualified possession of any "Developments" irrespective of whether SpecSys has been compensated therefor. *See, e.g.*, Pls' Resp. (Doc. No. 289) at 3; Pls' Mot. (Doc. No. 349) at 15-17. SpecSys urges a different construction, under which CMI Inc.'s right to possess the "Developments" is subject to SpecSys' statutory right to withhold delivery of work product for which it has not been paid. Def.'s Resp. to Pls' Trial Br. at 21-22.[14]

---

[14] To support its asserted right to withhold delivery of work product, SpecSys cites Oklahoma's possessory lien statutes (Okla. Stat. tit. 42, §§ 91, 91A), as well as the UCC provision enumerating a seller's remedies in the event of a buyer's failure to make payment

17

To the extent there exists any ambiguity in the subject provision, such ambiguity arises from the language employed by the parties, as opposed to some extrinsic fact, and is therefore capable of resolution by the Court. *See Okla. Oncology*, 160 P.3d at 946. Ambiguous contract language must be construed "in a fair and reasonable sense" taking into consideration "the facts and circumstances surrounding [the contract's] making." *Scungio v. Scungio*, 291 P.3d 616, 622-23 (Okla. 2012), *as corrected* (Nov. 5, 2012); *see also* Okla. Stat. tit. 15, § 163 ("A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates.").

As noted, the parties executed the NDA to govern the exchange of confidential information in furtherance of the work contemplated by the Purchase Orders. Under the Purchase Orders, SpecSys promised to create intellectual property, including by using and/or improving upon CMI Inc.'s existing intellectual property, in exchange for payment from CMI Inc. Considering the circumstances under which the NDA was made, and the context of the Purchase Orders to which the NDA relates, the Court finds that to construe the NDA in a way that would permit CMI Inc. to fail in its payment obligations under the various Purchase Orders, but still take possession of the "Developments," i.e. intellectual property or products containing at least some degree of SpecSys' work, is not a "fair and reasonable" view of the cited provision. Rather, considering such circumstances and context, the Court finds that the only "fair and reasonable' construction of the language of

---

when due (Okla. Stat. tit. 12A, § 2-703). *Id.* With respect to transactions not governed by the UCC, the Court is not convinced that SpecSys' interest in work product is properly conceptualized as a possessory lien under Okla. Stat. tit. 42, § 91 or § 91A.

the NDA is to assign the "Developments" to CMI Inc. *upon* satisfaction of an implied condition: payment by CMI Inc. for work duly performed by SpecSys as agreed.[15] *See Whitehorse v. Johnson*, 156 P.3d 41, 46 (Okla. 2007) ("A contract includes not only the promises set forth in express words, but all such implied provisions as are indispensable to effectuate the intent of the parties and as arise from the language of the contract and the circumstances under which it was made."); Okla. Stat. tit. 15, § 171 ("Stipulations which are necessary to make a contract reasonable or conformable to usage, are implied in respect to matters concerning which the contract manifests no contrary intention."); *see also Softketeers, Inc. v. Regal W. Corp.*, No. SACV 19-519, 2019 WL 4418820, at *5-6 (C.D. Cal. June 17, 2019) (characterizing as an "assignment" a contract provision stating that "[a]ll right, title, interest, copyright, or other intellectual property interests in the Program which [are] developed by Consultant for [Defendant] under this Agreement . . . shall become and remain the property of [Defendant]"); *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364-65 (Fed. Cir. 2010) (explaining that language used to convey ownership of intellectual property determines whether the assignment is "automatic," in which case "the transfer of title occurs by operation of law," or merely "obligate[s] the owner to grant rights in the future," in which case there is "not an immediate transfer of

---

[15] This construction does not mean that, in the absence of payment, SpecSys is free under the NDA to do whatever it might wish with the intellectual property it created by using or improving upon CMI Inc.'s confidential information. SpecSys remained obligated to not use or disclose CMI Inc.'s confidential information; it likewise remained obligated not to use or disclose the intellectual property in a manner that is inconsistent with CMI Inc.'s purported ownership rights. *See* Doc. No. 78-9 at 3-4.

expectant interest").

Accordingly, the Court will—as appropriate—instruct the jury consistent with this interpretation of the NDA. Extrinsic evidence on this question will not be allowed.

IT IS SO ORDERED this 1st day of July, 2021.

_____
CHARLES B. GOODWIN
United States District Judge